IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MONTY WAYNE LAMB | § |
| Petitioner, | § |
| VS. | § |
| | § NO. 3-06-CV-1000-M |
| NATHANIEL QUARTERMAN, Director Texas Department of Criminal Justice, Correctional Institutions Division | § |
| Respondent. | § |

## FINDINGS AND RECOMMENDATION OF THE
## UNITED STATES MAGISTRATE JUDGE

Petitioner Monty Wayne Lamb, a Texas prisoner, has filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated herein, the application should be denied.

I.

A Dallas County grand jury indicted petitioner for capital murder. After waiving his right to a jury trial, petitioner was convicted by a judge and sentenced to life imprisonment.[1] His conviction and sentence were affirmed on direct appeal. *Lamb v. State*, No. 11-00-00295-CR, 2003 WL 1191923 (Tex. App.--Eastland, Mar. 13, 2003, pet. ref'd). Petitioner also filed an application for state post-conviction relief. The application was denied without written order. *Ex parte Lamb*, WR-61,867-01 (Tex. Crim. App. May 24, 2006). Petitioner then filed this action in federal district court.

---

[1] The state did not seek the death penalty.

II.

In three grounds for relief, petitioner contends that: (1) he received ineffective assistance of counsel when his attorneys failed to present evidence to support a potential alibi defense; (2) counsel did not object to an out-of-court statement made by a non-testifying accomplice as violative of the confrontation clause; and (3) he is actually innocent.[2]

A.

The Sixth Amendment to the United States Constitution guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonable professional conduct. *Id.*, 104 S.Ct. at 2064. Second, the petitioner must prove that he was prejudiced by his attorney's substandard performance. *Strickland*, 104 S.Ct. at 2067. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068.

---

[2] Petitioner raised at least 22 claims in a poorly organized *pro se* application for writ of habeas corpus filed on June 7, 2006. Thereafter, petitioner was diagnosed with a terminal illness and asked the court to appoint a lawyer to represent him. In granting the request, the court allowed counsel to file an amended pleading containing "all grounds upon which petitioner challenges his state conviction." *See* Order, 3/10/08. Consistent with Fed. R. Civ. P. 15(a), petitioner was told that the amended pleading "will supersede any prior pleadings filed by petitioner in this case." *Id.*; *see also Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) ("[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading."). The court therefore considers only those claims raised by petitioner in the amended pleading filed by his attorney on April 30, 2008.

Where, as here, a state court has already rejected an ineffective assistance of counsel claim, a federal court may grant habeas relief only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 411-13, 120 S.Ct. 1495, 1522-24, 146 L.Ed.2d 389 (2000). A state court decision is contrary to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir.), *cert. denied*, 124 S.Ct. 2812 (2004), *citing Williams*, 120 S.Ct. at 1523. A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S.Ct. at 1523; *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). Factual determinations made by state courts are presumed to be correct and are unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

1.

Petitioner and three accomplices were charged with capital murder in connection with the shooting deaths of Phillip Elliott, Marla Speaker, and Laura Page during a drug robbery.[3] At trial,

---

[3] Under Texas law, a person commits the offense of capital murder if, *inter alia*, "the person murders more than one person . . . during the same criminal transaction." *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (Vernon 2007).

most of the evidence against petitioner came from William Hardison, one of the accomplices, and three drug dealers. Hardison testified that he met petitioner at the home of John Brown, another accomplice, on December 8, 1997. (SF-VI at 15-16). After petitioner arrived at the house, Brown gave Hardison some methamphetamine and asked him to hold onto his gun. (*Id.* at 18). Hardison complied and put the gun in his coat pocket. (*Id.*). Later that day, Brown said he knew somebody that has "a lot of dope" and asked Hardison about "robbing them." (*Id.* at 19). Hardison testified:

> I told him, well, I don't know, I ain't never did it before, but yeah, ain't nobody going to get hurt or nothing, is that why you gave me the gun? Maybe somebody is going to get hurt? He said, no, man, it's just for show. I [said] you sure nobody is going to get hurt or nobody is going to get killed in this because, man, you hear it all the time on the news about people robbing somebody and they shoot them or somebody gets hurt. He said like, no, man, it's just all for show. I need you there because it might be like three or four people there, and I need you there for show, you know.

\* \* \* \*

> And he said no, ain't nobody going to get hurt. I said, well, all right. So, I agreed. You know, I agreed we were going to go over there and jack these people for the dope. Go in there and get it and leave.

(*Id.* at 19-20).

Hardison said that he left the house with petitioner, Brown, and Ann Marie Wilson, also known as "Christy." (*Id.* at 22). Upon arriving at the apartment where the robbery was to occur, Christy knocked on the door and identified herself to the occupants. (*Id.* at 24). As the door opened, petitioner "busted in," followed by Brown and Hardison. (*Id.*). According to Hardison:

> We got inside and Lamb was yelling at the people to get down on the floor. The girl--as soon as we got in [Christy] went over to the stereo and turned up the stereo, and I was like I had been up, man, I was on speed, and I was like, man, why have you-all got that music so loud for.

>Q: [BY PROSECUTOR]. Did it seem very loud to you?
>
>A: Yeah, it was real loud, you know. It startled me, you know.
>
>Lamb told me to get over there. He said get your gun, Will, and hold it on these people, and I was holding it on these people, and this dude asked me--he said, man, you-all don't kill me. I said, man, ain't nobody going to kill you, man, we just want your dope. We are just going to take your dope.
>
>Q: And what was John Brown and Christy doing?
>
>A: Christy was running around there pulling the cushions up, slinging them around, looking up under it, trying to look up under the sofas and running through there, and John Brown was in the back running through there, and he was yelling at Christy, "Find the dope, find the dope," and it was a pile of dope over on the table, and Lamb tasted of it, you know, and it was over there and people was crying and I told them, man, ain't nothing to worry about, ain't nothing going to happen to you, na, we're just going to take your dope, and be off, you know--and excuse me--John came back through and Christy and Christy was on dope, too. She was all skitzed out, running around there and everything, and John grabbed a'hold--not John, but Lamb grabbed a'hold of my coat and he pointed a gun to me and told me, Will, you're going to have to kill these people. I said, man, I ain't killing these people, man, I ain't doing it. He said, yeah, Mother F----r, you are or I'm going to kill you and kill them, too. And I was like man, I just can't kill these people, man, and for an instant I kicked over to my left and closed my eyes. Christy running around there and pulling up cushions, and the music was wide open, and Lamb over there yelling in my ear, Mother F----r, you're going to kill them, you know, or I'm going to kill you. And I raised my gun up and all I could see was like a tunnel, just seeing those people, and I knew--I was like man, I don't really know this dude, if he's bullshitting or what, man, but he's got a gun upside my head yelling at me in my ear, the radio blaring and I just started shooting.

(*Id.* at 24-26). Hardison said that he fired the gun five times, striking a man and two women. (*Id.* at 34-35). After the shooting, petitioner drove Hardison and the others to Brown's house, where Brown gave Hardison some methamphetamine and told him to forget what happened. (*Id.* at 37).

The bodies of three victims, later identified as Elliott, Speaker, and Page, were discovered at their Dallas apartment around 4:15 that afternoon. (*See* SF-V at 30, 148, 172-73, 183, 204, 217).

Three other witnesses also linked petitioner to the shootings. John Betts, an admitted drug dealer, testified that he encountered petitioner in December 1997 at the home of Walter Bryan Ashlock. (SF-IX at 34-35). Betts said that petitioner and John Brown stormed into the house looking for drugs. (*Id.* at 35-38). When Ashlock ordered the men to leave, petitioner stated, "Mother F----r, I've already got three dead, one more wouldn't matter." (*Id.* at 40). Ashlock offered similar testimony at trial:

> I turned around to walk back to my bedroom to get my own weapon, and [Lamb] goes, "No, I don't think you understand," and as I turned back around [he] had a nine-millimeter pointed right at my head. Then we started closing the gap between us. He says--I say, "What are you going to do, are you going to f---ing shoot me? Are you going to shoot me, Mother F----r -- what the f---, why are you going to [shoot] me, man?" He just said, "Just give me the f---ing shit, just give me the f---ing shit." And at that point I grabbed the gun, we are wrestling over this gun, fighting over this gun, the gun's going like this (indicating), we work our way all the way back over to the front door. At that point John Brown and John Alan [Betts] come back in the room--come back in the front door. John Brown sticks the gun--sticks his gun, which was a little 22, a black and gold 22, to my chest and [Lamb] has got the gun pointed directly at my head, he finally got the gun jerked out of my hand at that point that John Alan and John Brown had walked back in, John Alan is standing there telling me, "What do you want me to do, man, what do you want me to do?" [Lamb] has the gun pointed--Monty Lamb has the gun pointed right at my head. I tell John Alan, I said, "Just go--just go, man," and John Alan leaves. At that point John says, "F--- it, we ain't..."--I'm telling that we ain't --I got no shit, there is no shit.

****

> And John says to [Lamb] --to Monty Lamb that "F--- this shit, man, let's just f---ing get out of here, f--- this shit man, let's just go, there is no shit, let's just go." And at that point [Lamb] is going "F--- that

> shit man, I'll kill this little Mother F----r, I'm going to kill this little Mother F----r," and John goes, "Come on, man, let's just f---ing go, we already have three hanging over our head." [Lamb] says, "F--- that, yeah, and I'll kill this little Mother F----r, too."

(SF-X at 28-29).

Another drug dealer, Jonathan Blaine Valentine, testified that he sold methamphetamine for petitioner on several occasions. (*Id.* at 70-71, 74). Valentine also knew the shooting victims. (*Id.* at 71). Sometime in January 1998, when Valentine mentioned to petitioner that he knew Elliott, petitioner told Valentine about a $100,000 drug deal with some "Mexicans" that Elliott was "f-----g on." (*Id.* at 73, 75). Later, Valentine reported to petitioner that he was having trouble collecting on a drug deal in Seagoville, Texas. (*Id.* at 75-76). Petitioner responded that "he had already took care of that Hundred Thousand Dollar deal, so he can take care of these little bitty old people in Seagoville." (*Id.* at 76). Once Valentine learned that Elliott had been killed, he understood that petitioner was bragging about the shooting. (*Id.* at 76-77, 84).

After considering the evidence, the trial judge found petitioner guilty of capital murder as alleged in the indictment. (SF-XIV at 114). Before announcing his decision, the judge commented on the credibility of several key witnesses. With respect to Hardison, the judge observed:

> Clearly, when Will Hardison says he killed those three people, I find that credible. I just don't see very many circumstances where somebody gets up on the witness stand and admits to killing three people in cold blood and you don't expect not to believe. Sociopath, mean dog, I don't care what you call him, that's the truth.

(*Id.* at 110). The judge also found that Betts, Ashlock, and Valentine--all of whom testified that petitioner bragged about the murders--were credible witnesses. (*Id.* at 113).

2.

In his first ground for relief, petitioner criticizes his attorneys for failing to present evidence to support a potential alibi defense. At issue is the missing testimony of Leisha Hatton, who testified at John Brown's trial that she was with petitioner in Fort Worth, Texas, from approximately 11:00 a.m. until 6:00 or 7:00 p.m. on the day of the murders. *See Ex parte Lamb*, WR-61,867-01, Tr. at 064. Around 3:30 that afternoon, Hatton said that she and petitioner went to pick up her car from a local repair shop. *Id.* An invoice and canceled check were introduced into evidence to corroborate that the car repairs were made on December 8, 1997. *Id.*, Tr. at 65-66, 76-77. Although Hatton was available to give the same testimony at petitioner's trial, she was not called as a witness. In sworn affidavits filed with the state habeas court, defense counsel explained that the dates shown on the repair invoice and check did not match the date of the murders, and "it would not have benefited Lamb to have [Hatton] testify that he was with her on a date different from the date of the offense." *Id.*, Tr. at 331; *see also id.*, Tr. at 337. The state court accepted this explanation and found that petitioner received reasonably effective assistance of counsel at trial. *Id.*, Tr. at 372-73, ¶¶ 6-7, 9-10.

The court initially observes that the record refutes the explanation offered by counsel for not calling Hatton as a witness. As petitioner correctly points out, both the repair invoice and the check are dated December 8, 1997--the same date as the murders. However, even if counsel's failure to present this alibi evidence fell below an objective standard of reasonable professional conduct, petitioner was not prejudiced thereby. In order to establish prejudice under *Strickland*, petitioner must show that the outcome of his trial was fundamentally unfair or unreliable. *See Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any

substantive or procedural right to which the law entitles him." *Id.*, 113 S.Ct. at 844; *see also Young v. Dretke*, 356 F.3d 616, 619 (5th Cir. 2004). Here, it is unlikely that Hatton's uncorroborated alibi testimony would have resulted in a judgment of acquittal.[4] First, four different witnesses gave compelling and consistent testimony linking petitioner to the murders. The trial judge found that all four witnesses were credible. Nothing suggests that the judge would have believed Hatton over these witnesses. Moreover, Hatton's testimony would have contradicted the alibi petitioner gave to the police. When asked about his whereabouts on the date of the murders, petitioner told a Dallas police detective that he was at John Brown's house with a girl named "Ronnie." (SF-XII at 92). Petitioner never said anything about being in Fort Worth with Hatton. In light of this evidence, petitioner was not prejudiced by counsel's decision not to call Hatton as a witness. *See, e.g. Taylor v. Abramajtys*, 20 Fed.Appx. 362, 364, 2001 WL 1136018 at *1 (6th Cir. Sept. 20, 2001) (holding that ineffective assistance of counsel claim based on failure to call alibi witness was "patently without merit" where petitioner's own statement to police refuted any alibi); *Kubat v. Thieret*, 867 F.2d 351, 362-63 (7th Cir.), *cert. denied*, 110 S.Ct. 206 (1989) (petitioner was not prejudiced by counsel's failure to call alibi witnesses where state presented significant evidence to corroborate testimony of accomplice to the murder).

3.

Petitioner further contends that he received ineffective assistance of counsel because his attorney did not object to an out-of-court statement made by one of the accomplices, Ann Marie Wilson, as violative of the confrontation clause. At trial, the defense called Wilson to testify.

---

[4] To the extent petitioner maintains that the repair invoice and check support Hatton's testimony, the court notes that neither document proves that petitioner was with Hatton on the date of the murders. At most, the invoice and check show that Hatton's car was repaired on December 8, 1997.

However, Wilson invoked her Fifth Amendment right against self-incrimination. (*See* SF-XI at 106-07). Later, when the prosecutor offered part of Wilson's statement into evidence, defense counsel objected on hearsay grounds. (*See* SF-XIII at 226-27; SF-XIV at 7-8). In response, the prosecutor argued that the statement was admissible because defense counsel asked a Dallas police detective about the contents of the statement on direct examination. (SF-XIV at 4-5). Once the trial court overruled the hearsay objection, defense counsel offered the entire statement into evidence. (*Id.* 8-10).

The portion of Wilson's statement originally offered by the prosecutor reads:

> I am not sure of the exact amount of time they were in [Speaker's] apartment. I heard gunshots, it was like a pop. I heard one pop and then pop pop pop. Within 30 [seconds] to a minute John and Monty were getting back in the car. Both of them were carrying weapons openly. They were telling me "go go." Monty popped me in the back of the head when I started asking questions. Then I turned around and said "what the f---" I saw John wipe his neck and chest with my blouse. He was wiping blood, it was most [definitely] blood. That is when I said "what did you do, what happened to [Speaker]."

\* \* \* \*

> In the car Monty and John were having a complete shouting match about money and dope. Monty was screaming at John about why did he leave all the dope there. "Why did you leave all the shit there."

(St. Exh. 123 at 2; *see also* SF-XIV at 7-8). In the state habeas proceeding, defense counsel explained that once their hearsay objection was overruled, "we made the strategic decision to demand the admission of all of [Wilson's] statements in order to show numerous inconsistencies and contradictions." *Ex parte Lamb*, WR-61,867-01, Tr. at 333; *see also id.*, Tr. at 339. Indeed, during their questioning of Sergeant Gary Kirkpatrick, the lead homicide investigator, counsel pointed to numerous inconsistencies in the statements given by Wilson and the other accomplices. (*See* SF-XIV

at 12-35). Ultimately, the state habeas court found that petitioner failed to present sufficient evidence to overcome the presumption that the actions of defense counsel were motivated by sound trial strategy. *Ex parte Lamb*, WR-61,867-01, Tr. at 373, ¶ 8. Petitioner now suggests that Wilson's statement could have been excluded had his lawyers argued that it violated the confrontation clause.

The Sixth Amendment guarantees the right of a defendant "to be confronted with the witnesses against him." U.S. CONST. amd. VI; *see also United States v. Harper*, 527 F.3d 396, 401 (5th Cir. 2008). In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the constitutional right to confrontation and cross-examination is violated when: (1) co-defendants are tried jointly; (2) one defendant's extra-judicial statement is admitted into evidence and used to inculpate the other defendant; and (3) the defendant who made the statement does not testify and, thus, is not subject to cross-examination. *Id.*, 88 S.Ct. at 1627-28. Later decisions extended *Bruton* to situations where the state seeks to introduce "a confession by an accomplice which incriminates a criminal defendant." *Lilly v. Virginia*, 527 U.S. 116, 130, 119 S.Ct. 1887, 1897, 114 L.Ed.2d 117 (1999), *quoting Lee v. Illinois*, 476 U.S. 530, 544 n.5, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986).

Assuming the strategic decisions made by defense counsel resulted in a confrontation clause violation, petitioner has failed to prove that he was prejudiced by the admission of Wilson's statement. Significantly, petitioner was convicted following a bench trial. Where a defendant is tried by a judge instead of a jury, the judge "is presumed to rest his verdict on admissible evidence and to disregard the inadmissible." *United States v. Cardenas*, 9 F.3d 1139, 1154 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 2150 (1994) (citing cases). This presumption applies with equal force to evidence improperly admitted in violation of the confrontation clause. *Id.* at 1154-55. As the Fifth

Circuit explained in *Cardenas*:

> [T]o apply *Bruton* to bench trials would be to conclude that judges, like jurors, may well be incapable of separating evidence properly admitted against one defendant from evidence admitted against another. Furthermore, absent an *express* reliance by a trial judge on a non-testifying defendant's pre-trial confession--which facially implicates a co-defendant--in determining that co-defendant's guilt, we do not see how a Sixth Amendment confrontation issue can arise in a bench trial.

*Id.* at 1155 (emphasis in original) (internal citations and quotations omitted). Here, the trial court expressed some doubt as to the veracity of Wilson's statement. In announcing his verdict, the judge commented:

> Now, Ms. Wilson, her statement when she gives it to law enforcement before she--and once again, you know, I have yet to see a statement where somebody painted themselves in such an aurora rainbow that you would have to believe everything, and the rule is that you can believe some, all or none of what any witness says, because there are pieces of truth in a lot of different areas.

(SF-XIV at 113). There is no indication that the judge relied on this extra-judicial statement in finding petitioner guilty of capital murder. Moreover, unlike the witnesses who testified for the state, the judge never found that Wilson was credible. The only part of her statement mentioned by the judge as having any indicia of reliability is the admission that she was present at the murder scene. (*Id.* at 113-14). And that was cited only to discount the testimony of a defense witness, Tammy Michelle Byrd, who said that she was with Wilson at the time of the offense. (*Id.*). Because there is no evidence that the trial judge based his verdict on any part of Wilson's statement that inculpated petitioner, the court is unable to conclude that petitioner was prejudiced by counsel's failure to object to the statement as violative of the confrontation clause. *See Cardenas*, 9 F.3d at 1155. This ground for relief should be overruled.

B.

Finally, petitioner contends that he is actually innocent. A claim of actual innocence, standing alone, is insufficient to merit federal habeas relief. *See Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 1250 (2001), *quoting Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993). There also must be evidence of an independent constitutional violation in the state criminal proceeding. *Id.* No such evidence exists here.

Nor is there any compelling evidence of actual innocence. In support of his claim, petitioner relies on an affidavit provided by Ann Marie Wilson recanting her prior statement and evidence suggesting that John Betts may have lied at trial. (*See* Am. Hab. Pet. at 37-42).[5] However, recanting affidavits and witnesses are viewed with extreme suspicion by the courts. *See Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir.), *cert. denied*, 117 S.Ct. 519 (1996). "When a witness has testified, he has received the benefit of any bargain that he had with the state and has nothing to lose by recanting his testimony." *Bell v. Dretke*, No. 3-04-CV-0492-P, 2006 WL 770442 at *6 (N.D. Tex. Mar. 27, 2006). Such evidence does not merit federal habeas relief. *Id.*

## RECOMMENDATION

Petitioner's application for writ of habeas corpus should be denied.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party may file written objections to the recommendation within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The failure to file written objections will bar the aggrieved party from appealing the factual findings and legal

---

[5] Petitioner also alleges that William Hardison recanted his trial testimony in an interview with a private investigator. (*See* Am. Hab. Pet. at 40). However, no evidence is proffered to support that assertion.

conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 8, 2008.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE